No. 302 April 15, 2026 481

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of L. D.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

L. D.,
*Respondent,*
*v.*

T. S.,
*Appellant.*

Multnomah County Circuit Court
Petition No.
114584;
22JU02030; A187516

Morgan Wren Long, Judge (Order entered April 10, 2025).

Sandra Y. Vallejo, Judge (Judgment entered June 2, 2025).

Argued and submitted on February 18, 2026; on respondent's motion to supplement the record and file late transcript filed March 25, 2026, and appellant's response filed April 8, 2026.

Tiffany Keast, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

Erin Galli, Assistant Attorney General, argued the cause for respondent Department of Human Services. Also on the brief were Dan Rayfield, Attorney General, and Paul L. Smith, Solicitor General.

Ginger Fitch argued the cause for respondent L. D. Also on the brief was Youth, Rights & Justice.

Before Shorr, Presiding Judge, Powers, Judge, and O'Connor, Judge.

POWERS, J.

Affirmed; motion to supplement the record and file a late transcript denied as moot.

**POWERS, J.**

Mother appeals from a judgment establishing a permanent guardianship for her child, L. Raising five assignments of error, mother challenges various points in the proceedings that resulted in the guardianship being established without mother being represented by counsel. As explained below, because we conclude that mother was not deprived of a fundamentally fair proceeding, we affirm. We, therefore, also deny as moot the motion to supplement the record and file a late transcript.

The facts relevant to the current matter are entirely procedural and generally undisputed. We discuss the proceedings in some detail, in order to give context to mother's arguments and our resolution. In April 2022, the Oregon Department of Human Services (ODHS) filed a dependency petition regarding L, and the juvenile court asserted dependency jurisdiction in March 2023. In July 2024, the plan was changed to permanent guardianship. Over the course of those proceedings, mother was appointed six different attorneys, each of whom withdrew from the representation due to a breakdown in the attorney-client relationship or mother informing the attorney that she no longer wished to be represented by them. The court ultimately appointed a seventh attorney, Kelly, as a legal advisor, and mother represented herself *pro se* at the permanency hearing. Following the change in plan, ODHS filed a petition to establish permanent guardianship, in August 2024. Mother continued to represent herself, with Kelly as her legal advisor.

In October 2024, Kelly filed a motion to withdraw as mother's legal advisor. At a review hearing at which mother did not appear, as she had not yet been served with the guardianship petition, Kelly withdrew the motion in order to provide additional time to confer with mother on whether she wanted to use Kelly's services. The court and Kelly discussed the possibility that there might not be anyone else available to take over as mother's legal advisor. In the review order that the court issued, it noted, "Given the number of attorneys that have previously represented [mother], there are serious concerns that there may not be another attorney who can serve as the mother's legal advisor."

At the initial appearance on the guardianship petition in early December 2024, the court discussed with mother and Kelly whether Kelly would continue as mother's legal advisor. Mother indicated that she believed Kelly was no longer her legal advisor and that she knew nothing about the October order. The juvenile court read her the portion of the order commenting on the concerns around allowing Kelly to withdraw and noted that the constant switching of counsel had caused substantial delay in achieving permanency for L. Ultimately, mother told the court that she was willing to have a meeting with Kelly to discuss Kelly continuing as her legal advisor, but mother emphasized that she was not guaranteeing it would work out between them. Mother repeatedly noted that she was representing herself, and that she needed to be included in all communications on the case, which the court acknowledged. The court issued an order summarizing the discussion that occurred at the hearing, noting that "questions remain" as to whether Kelly would continue in the role of legal advisor.

Two weeks later, mother appeared at a follow-up hearing. She told the court that she had canceled the meeting with Kelly, due to the death of a person close to her, and that they had not had a conversation about Kelly's role. The juvenile court engaged in further conversation with mother and Kelly about their working relationship, including noting the low odds of anyone else agreeing to be legal advisor on the case, and observing the difference in availability of legal advisors versus counsel of record. Trial was scheduled for four months out, during the second week of April, to give mother time to prepare and meet with Kelly to decide whether she wanted her to continue as her legal advisor.

During that hearing, mother told the juvenile court that she had made up her mind and did want Kelly to withdraw, because she did not want ODHS to communicate with anyone other than her about the case. She further told the court that she had not made a decision about whether she would be requesting another attorney. ODHS noted that it would object to any further setovers of the April trial dates if mother sought additional counsel and asked for a continuance. The court then told mother that she did not get "an

indefinite amount of time to decide whether or not you want another attorney and what role and what form that comes[.]" The court ultimately declined to allow Kelly to withdraw, and encouraged mother to have a conversation with Kelly to clarify some of mother's confusion regarding her rights to counsel. The court gave mother 30 days to determine whether or not she was going to seek a different legal advisor. The court issued an order to appear for a follow-up pretrial hearing a month later, and in the order summarized the latest discussions. The order noted the court's conclusion that the continuation of a legal advisor was needed based on mother's inability to follow the court's basic rules and procedures and that the issue of legal advisor could be raised at any future hearings.

At the early January 2025 pretrial hearing, mother interrupted the discussion of discovery issues to announce that she wanted to terminate Kelly. Kelly told the juvenile court that mother did not wish to speak to her, so there was not much she was able to do as legal advisor. The court attempted to have a colloquy with mother about her rights and what she was giving up by terminating Kelly; however, mother refused to engage in the colloquy, qualified her answers, and accused the court of trying to trick her into keeping a legal advisor that she did not want. The court ultimately determined that it could not find mother's waiver to be knowing and voluntary without mother signing something acknowledging the rights she was relinquishing. Mother explained to the court that she was not waiving her right to a legal advisor, that she was just asking to terminate Kelly, and that she did not know if she would be requesting a new legal advisor or asking for new counsel of record. The court informed her that it would not be entertaining a request for another legal advisor when she had not utilized her current one and that it would not entertain a request for an attorney of record because mother had made it clear on the record that she wanted to be fully in control of her case, and that was not what an attorney of record would do.

Following another failed attempt at a waiver colloquy, the juvenile court acknowledged mother's statement that she was specifically not waiving her right to counsel,

but explained that through her actions she may have waived her ability to seek future appointment of counsel. The court therefore continued Kelly's appointment as legal advisor. In a post-hearing order, the court memorialized the discussion at the hearing, including finding that mother refused to engage in the colloquy, and that the court informed her of her right to file a written and signed statement declining the use of the legal advisor. The order provided, in part:

> "[Mother], however, made clear that she was not waiving her right to either a legal advisor or an attorney of record. She also repeated her reasoning behind requesting the termination of her legal advisor, having a legal advisor allows the other parties with opportunities to have communication without including the mother. She also made clear that she is opposed to an attorney determining the trial strategy. This court has previously advised [mother] that her actions can create an implicit waiver of her right to counsel or to a legal advisor."

A month and a half later in late February, Kelly moved to withdraw, citing an irreparable breakdown in the relationship that would not allow for further legal advising, and stating that professional considerations required termination of the relationship. The juvenile court granted the motion on March 5. Trial was set to begin on Monday, April 7, with pretrial call the Thursday before, April 3.

On the afternoon of April 2, mother filed a motion for a continuance of both the April 3 call and the April 7 trial date. Mother's motion listed four reasons for the request: (1) that she did not have counsel or an attorney advisor, given Kelly's withdrawal, and therefore had not had any assistance in the weeks leading up to trial; (2) that there were issues with her being able to review discovery in anticipation of trial; (3) that someone close to her had passed away in December and she had been struggling since that time; and (4) that she had not been provided with accommodations for her disabilities. She requested that the trial be set over for at least three months to give her the chance to grieve, recover, and prepare for trial.

At call on April 3 before Judge Henry, the juvenile court inquired into mother's various justifications for the

continuance and, ultimately, denied mother's motion. With respect to her lack of counsel, the court observed that mother had been informed numerous times that asking for replacement counsel just before hearings could be viewed as intentionally causing delay, and confirmed that mother had done nothing over the past month since Kelly's withdrawal to request a new attorney. The court further confirmed mother's expectations about communication and control over her case, noting that her expectations did not align with the role of an attorney. The court made findings on the record and in a written order that "Mother's request for a new attorney in this case is not in good faith and is made for the purpose of delay," and that "the appointment of an attorney in this matter would be futile."

On April 7, mother appeared for trial before Judge Long. During preliminary matters when the juvenile court attempted to address mother's request for accommodations for her disabilities, mother asserted that she did not have a lawyer and had not been able to prepare. Judge Long noted that mother had gone over those things with Judge Henry and that they would not be readdressed. Mother declined to participate in the trial, was held in contempt when she refused to take the stand after being called as a witness, and eventually left the courtroom during the first witness's testimony and did not return. ODHS put on its case, and the court ultimately determined that ODHS had proved by clear and convincing evidence that all allegations in the petition to establish guardianship were true.

On May 30, a final hearing was held before Judge Vallejo to finalize the guardianship. At the end of the hearing, mother objected to the establishment of the guardianship, noting she had been "deprived of an attorney," had never waived her right to counsel, and did not have an attorney at the trial and multiple other times throughout the case. She told the juvenile court that she was appealing the order and wanted a rehearing and an attorney appointed. Judge Vallejo observed that Judge Henry had denied the request for an attorney on April 3, and that that ruling carried into the current proceedings. The court issued an order and judgment establishing the permanent guardianship.

On appeal, mother raises five combined assignments of error relating to the guardianship being established without mother being represented by counsel. As an initial matter, we note that mother's assignments of error do not identify specific rulings that are being challenged, contrary to the requirements of the Oregon Rules of Appellate Procedure. *See* ORAP 5.45(3) (providing that "[e]ach assignment of error must identify precisely the legal, procedural, factual, or other ruling that is being challenged"). For instance, mother's third assignment of error contends that the juvenile court erred on April 7 by not appointing counsel for mother for trial. However, as described above, mother did not request an appointment of counsel on April 7, and the juvenile court made no ruling on that issue. At the April 7 trial, mother only commented that she was not prepared because she did not have counsel and the court noted that that issue had been addressed four days earlier and would not be revisited.

Similarly, in her first assignment of error, mother asserts that the juvenile court erred when it "concluded that mother's conduct * * * effected an implied waiver of her right to court-appointed counsel" by engaging in misconduct. To the extent that that "conclusion" can be construed as a ruling, the record contains no such ruling. On January 10, the court explicitly determined that it could not conclude that mother had made a knowing and voluntary waiver of the right to counsel, due to her refusal to engage in the waiver colloquy. That ruling was never revisited. Judge Henry, at the April 3 call hearing, found only that mother's request for counsel was not made in good faith and was made for purposes of delay, and he therefore denied her motion for a continuance.[1] The court did not conclude that mother had impliedly waived her right to counsel. Because mother's first assignment of error does not correspond to the facts of the proceeding and does not identify an actual ruling by the court that she finds objectionable, we reject that assignment of error.

[1] We note that mother did not explicitly request that counsel be appointed. Her only motion was for a continuance. Judge Henry treated the motion and discussion at the hearing as a request for counsel and denied that implicit request based on his findings that it was not made in good faith and that appointing another attorney would be futile. The written order denied mother's motion for a continuance, which mother has not assigned as error on appeal.

Mother's remaining arguments raise a general challenge to the guardianship being established without her having been appointed counsel. To the extent that mother argues on appeal that the juvenile court incorrectly concluded that she waived her right to counsel during the permanency phase of the proceedings, that argument is not properly before us because she has not challenged the permanency judgment that changed the plan away from reunification.[2] And, regardless, the juvenile court confirmed with mother in the guardianship proceeding that she was proceeding *pro se* and had explicit conversations with her that she had a right to counsel that she could invoke, but mother never did invoke that right. To the extent that she suggests that any judge had a *sua sponte* duty to appoint counsel, or that mother had an absolute right to counsel in the proceeding and could not be forced to proceed *pro se*, we reject those propositions.[3]

The right to counsel in juvenile dependency proceedings derives both from state statute and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 188 n 13, 796 P2d 1193 (1990). ORS 419B.205 governs when an indigent parent is entitled to counsel in dependency proceedings other than termination of parental rights. Under

---

[2] The parties spent significant time at oral argument debating the existence and relevance of a June 11, 2024, *ex parte* hearing where mother might or might not have engaged in an on-the-record waiver colloquy with the juvenile court. The record on appeal does not include a transcript of a hearing on June 11. The juvenile court issued an order on June 11 allowing the withdrawal of mother's sixth attorney and appointing Kelly as a legal advisor only, per mother's request, that indicated that mother "was informed of the difference between a legal advisor and an attorney of record."

While the matter was under advisement, ODHS filed an emergency motion to supplement the record with the transcript of the June 11 hearing; mother opposes the motion and asks, if we grant the motion, for leave to withdraw her opening brief and for re-argument. Because no portion of the dependency proceeding is currently at issue, we conclude that the June 11 hearing is immaterial to the resolution of this matter. Thus, we deny ODHS's emergency motion. Although there may be good cause to allow the motion given the unique circumstances of this appeal, we ultimately deny the motion as moot given our decision in this case.

[3] In a memorandum of additional authorities filed after oral argument, mother cites *Dept. of Human Services v. P. G.*, 348 Or App 398, ___ P3d ___ (2026), in support of her argument. The facts and procedural history of this case are sufficiently different from those presented in *P.G.* that we conclude that *P.G.* is not helpful to our analysis in this case.

that statute, a juvenile court is required to appoint counsel "whenever the nature of the proceedings and due process so require." ORS 419B.205(1). Thus, in proceedings other than termination of parental rights, "a juvenile court retains authority to deny a parent's request for counsel *** if the nature of the proceeding and due process do not require representation." *Dept. of Human Services v. T. L.*, 358 Or 679, 688, 369 P3d 1159 (2016).

Due process requires that parents be provided with "fundamentally fair" procedures such that they have the "opportunity to be heard at a meaningful time and in a meaningful manner." *Geist*, 310 Or at 189-90. As we have previously noted in the context of dependency cases, "For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined. It is not a technical conception with a fixed content unrelated to time, place and circumstances. Accordingly, due process is flexible and calls for such procedural protections as the particular situation demands." *Dept. of Human Services v. J. M.*, 266 Or App 453, 459, 338 P3d 191 (2014), *rev den*, 356 Or 685, and *rev den*, 356 Or 689 (2015) (internal quotation marks, citations, and brackets omitted).

In *Mathews v. Eldridge*, 424 US 319, 334-35, 96 S Ct 893, 47 L Ed 2d 18 (1976), the Supreme Court of the United States explained that, when a court is charged with deciding if due process was satisfied in a particular instance, the court generally must evaluate three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the *** burdens that the additional or substitute procedural requirement would entail." *Id.* Oregon courts have applied those criteria in evaluating whether a parent was provided with due process in dependency proceedings. *See, e.g.*, *J. M.*, 266 Or App at 459-63 (applying *Mathews* factors to parents' claim of due process violation related to evidentiary issues); *Dept. of Human Services v. W. S. C.*, 248 Or App 374, 386-390, 273 P3d 313, *rev den*, 352 Or 341 (2012) (evaluating

*Mathews* factors in deciding whether a statute dictating appellate timelines provided a parent with due process).

There is no debate that a proceeding to establish a permanent guardianship is one that affects a significant interest for a parent. Any dependency situation in general has the potential to interfere with a parent's liberty interest in controlling the care and custody of the parent's child. *J. M.*, 266 Or App at 461; *see also Troxel v. Granville*, 530 US 57, 65, 120 S Ct 2054, 147 L Ed 2d 49 (2000) (observing that the "liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court"). A permanent guardianship in many ways is akin to the termination of parental rights, in that it results in a deprivation of the right to parent the child. *See Dept. of Human Services v. T. M. D.*, 365 Or 143, 164-66, 442 P3d 1100 (2019) (discussing the similarities between termination of parental rights and permanent guardianship, and that both require a finding that it is in the best interest of the child that the parents never have physical custody). Mother had a significant liberty interest in the outcome of the permanent guardianship proceeding.

On the other hand, the state also has an urgent interest in the welfare of children and their best interests, including "a strong interest in finality" and "having those disputes resolved as expeditiously as possible." *J. M.*, 266 Or App at 461 (citing *Lassiter v. Dept. of Social Services*, 452 US 18, 27, 101 S Ct 2153, 68 L Ed 2d 640 (1981), and *Geist*, 310 Or at 186). L had been in substitute care since 2022. The trial dates had been on the calendar for four months and the petition to establish guardianship had been pending for nearly eight months by the time of trial. Furthermore, the court had repeatedly acknowledged that there could be significant difficulty in locating another attorney who could represent mother, given the termination of six prior attorneys of record and an additional attorney legal advisor, and the limited number of attorneys and law firms that perform this kind of work. The state and L had a significant interest in resolving the matter and achieving permanency for L and not further postponing the resolution.

In light of those competing interests, our decision largely turns on the second *Mathews* factor, *viz.*, the risk of an erroneous deprivation of mother's interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards. It is well established that there are risks to parents representing themselves, particularly given the complex issues involved in dependency proceedings. *Dept. of Human Services v. J. S.,* 339 Or App 695, 705-08, 568 P3d 995, *rev den*, 374 Or 379 (2025) (discussing the importance of a knowing and intelligent waiver of the right to counsel in light of the risks of self-representation). Typically, we would readily conclude that a parent has a better chance of achieving a favorable outcome when opposing a permanent guardianship if the parent has appointed counsel and utilizes counsel's services. As demonstrated by the juvenile court's factual findings, however, this case is atypical and significantly deviates from that sort of typical situation.

Judge Henry made factual findings at the April 3 call hearing that mother was not requesting counsel in good faith and was only making the request for purposes of delay. Based on her past statements and her statements on April 3, Judge Henry found that she did not actually want someone to perform the role of an attorney, and therefore there was no reason to believe that her relationship with an eighth attorney would be any different than her relationships with the previous seven. Mother has not challenged those findings of fact on appeal. Moreover, even if she did, they are supported by the record and thus are binding on us under our standard of review. Thus, given the entire context, there was a low probability that appointment of another counsel would have added any procedural protections to these particular proceedings. Accordingly, we conclude that mother was provided with "fundamentally fair" procedures.

In short, mother had the "opportunity to be heard at a meaningful time and in a meaningful manner." *Geist*, 310 Or at 189-90. Mother was repeatedly informed that her right to counsel was not unlimited, that there were time and personnel constraints on locating counsel for her, and that last minute requests could be viewed as being for purposes

of delay. Considering the flexible nature of due process requirements, and the demands of this particular situation, we conclude that the trial court did not err.

Affirmed; motion to supplement the record and file a late transcript denied as moot.